Equal Employee Opportunity Commission v. STME, LLC Our next case is the Equal Employment Opportunity Commission v. STME case and with Ms. Lowe as the potential intervener as well. Case numbers 18-11121 and 18-12277. Mr. Horowitz. Good morning, Your Honors. May it please the Court. Jeremy Horowitz with the EEOC. I'd like to reserve three minutes for rebuttal if I could. In September of 2014, Massage Envy granted Ms. Lowe's request for time off to go visit her sister in Ghana. A month later, three days before she was supposed to leave on her trip, Massage Envy told her that if she went ahead with the trip she would be terminated because it was worried that she would contract Ebola while there and come back and, in its words, come back to Tampa and in fact bring it back to Tampa and infect everyone. The District Court, in assessing this, found that the behavior was woefully ignorant and deplorable but nevertheless found that it didn't state a violation of the ADA based on the timing of the termination. But in fact, when looking at the ADA's language, its context, and the cases interpreting it, it's clear that these allegations fit comfortably within the ADA's protections. Within which protection do they fit comfortably? Well, the ADA protects employees against being discriminated against because an employer regards the employee as having an impairment. And in this case, the impairment at issue would be the infection with Ebola. Similar to the Arlene case, which held that being regarded as being infected with a statuted issue. Did they, and I should say I'm very sympathetic to the client's claims, but did they think that she had Ebola? Did they regard her as having Ebola? They regarded her as certain to have Ebola by the time she returned for her next scheduled shift. So at the time they made that decision, they didn't yet think that she had Ebola. That's the tricky part, isn't it? Well, not tricky when looked at in the context of the Dictionary Act and how that tells us to interpret the statutes in general. The Dictionary Act says that a statute is to be, its use of the present tense is to be used to include the future tense, so long as that doesn't contradict the context, so long as that doesn't, isn't in conflict with the context of the statute. And here we know the context of the statute is specifically to keep employers from making decisions based on unfounded concerns, mistaken beliefs, myths, fears, and prejudice, which is precisely what happened here. So far from being against the context of the statute, in fact, this is sort of a paradigmatic case of what the statute is supposed to protect against. Your best argument, it seems to me, is maybe not this case, given the specific facts that are involved, but that your legal theory applies to an employer who believes that a client has a latent disease that hasn't yet manifested itself. For example, an employer finds out that an employee has a family history of a degenerative disease, and general research shows that that disease is passed on from generation to generation with real frequency, and the employer doesn't want to be saddled with huge insurance costs when it believes that that disease might manifest itself. And so before that event happens, it says, oh, you know, because we think you're going to get this disease in the next three to four years, given current statistics, we're going to let you go now. Well, that's correct, Your Honor, but in this case, I think the linkage is even stronger, because there's always going to be some need to show causation, and when the predicted disability or when the anticipated disability is so imminent, there's no additional need for causation involved. In the case that Your Honor is hypothesizing, that would involve sort of more of an attenuated linkage there, not if the employer says it. I'm sorry, if the employer says it. It's like in this case, the employer made it completely clear. According to the allegations in the complaint, the employer made it pretty clear that the reason it was taking this action was because she was going to go to Ghana. That's true. That's exactly right. In this case, really, the imminence is unquestioned in this case. It thought that she would have the This, again, is not this case, but are you familiar with the Genetics Information Act? Yes, Your Honor. Wouldn't that cover the family history situation? It could, potentially, if it was a matter of genetics involved, and I believe what you're getting at, in part, is in our guidance, it talks about a characteristic predisposition to illness, which I think would be covered under GINA, but in this case, there was no characteristic predisposition involved at all, and the cases interpreting that provision in the guidance aren't really applicable to what's going on here. What would the employer have been allowed to do? I'm gonna switch the facts on you a little bit. What would the employer, in your view, have been allowed to do had she gone to Ghana and, in fact, contracted Ebola? So, if the employer has a No, she does. It's just she comes back and she tests positive. What is the employer able to do at that point in time? There's no doubt in my hypothetical. Okay. She has it. She has it, and she's been sent for an individualized medical exam in that case to determine that she, in fact, does have it? Somehow, some way, either in Ghana or on the way back to the, or upon arrival here, a doctor has said she has it. Got it. In that case, the employer is allowed to have a, I mean, in that case, the direct threat provision defense would apply, and the employer can keep her out of work as long as she continues to provide that direct threat, but before it can make that decision, it can't rely on these unfounded concerns and mistaken beliefs. It needs a medical judgment based on, sort of, a reasoned medical opinion that takes into account the duration, the nature of the harm at issue, its duration, the magnitude, and so forth. So, the employer certainly can do that, but before they can take that step, they need to have a reasonable basis for their belief. In at least the Ninth Circuit BNSF case, didn't the EOC take the position that the impairment had to be a current impairment in order to be regarded as having that impairment? That was, in, with reference to the facts of that case, that was true, but in... Why did the facts of that case lead to a different... That's more, to my mind, that's more of a legal conclusion than a factual conclusion, whether an impairment has to be anticipated or in existence. Are you speaking of the case with the disc problem with the back? Yes, I think so. Okay, well, in that case, if the employer treats the employee as having this, as having this impairment, then it's regarding the employee as having the impairment. If there's more attenuation, so it's not certain about when this impairment is going to kick in, but it doesn't think that the impairment has happened yet, then that's a, that's a different case. But again, there's no characteristic predisposition at issue in this case. It's very, it's a very different factual scenario. If I could turn briefly to the association claim, in addition to the same arguments that I believe apply here to the termination, they also apply to the association case in terms of the reading of the statute, but in addition, the district court erroneously held that the association has to be with an individual who the employer correctly believes has an ability to include, regarded as having an impairment, whether or not the employer's understanding in that context is correct. So, in that, the district court just disregarded that portion of the statute in finding that there was a need for the employer to actually be correct before that provision of the statute applies. I'm not sure I understand your associational theory. Could you? Sure. The EEO, I'm sorry, the ADA protects employees against discrimination based on the employee's association with somebody who has a disability. And so, in this case, she was going to associate with people in Ghana who the employer thought had the disability. The district court held, well, that can't state an association claim because there was no Ebola in Ghana and therefore these people couldn't have had that disability, but it regarded these people as having. Does that part of the statute have extraterritorial effect? There's no reference to whether or not the association is with somebody within the United States or elsewhere. It simply does the person have. That's why I'm asking you the question. I mean, I think it certainly would apply in this case if the discrimination is against Ms. Lowe because of her association with somebody, even that if that person happens to be extraterritorial. Because the discrimination is happening within the United States. Right, to somebody who is within the United States. Is there any case law that you know of regarding whether the individual with whom the employee has to have an association has to be a known individual or even a particular person as opposed to some expected set of unknown individuals? Well, in terms of the unexpected set of known, I mean, that's really two questions. And I see my time is out, but if I could just respond to that question. That's really two questions there. The first is whether the individual has, the associate has to be specifically identifiable. And in the case, well, in the statutory history, it says that if the discrimination is against somebody volunteering with AIDS victims, for example. I mean, there's no reason to think that it has to be a specific individual that the association is with. And with respect to whether or not that known disability, the employer's imputation of a disability to the association, whether that has to be accurate or not. We did say, I mean, the factual scenario doesn't come up very often, to be honest. But we did cite two cases in the brief in which courts were perfectly willing to entertain an association claim even when the associate did not actually have the impairment at issue. So I will reserve the rest of my time for rebuttal. Thank you. All right, thank you very much. How do you pronounce your last name, Nadeau? Nadeau. Nadeau, okay. Thank you. May it please the court, my name is Michelle Nadeau. I am here on behalf of Merlee Lowe, the employee in this case who was incriminated. I intend to spend the bulk of my time with you discussing the denial of Ms. Lowe's motion to intervene, but I do want to state that we join in the EEOC's argument today with respect to the merits of its case and believe that the authority cited in our brief is that the primary focus should be on the discriminatory intent, which is very clear in this case, and not on the health status of a third party like the defendant would ask this court to do. In this case, my client was denied her right to participate in the underlying lawsuit. Our appeal is based on this denial. In a case where the EEOC has chosen to in the EEOC's case, and that right to intervene is unconditional so long as it is timely, and that is provided for in Rule 24, the Federal Rules of Civil Procedure, state that on a timely motion, a court must permit anyone to intervene who is given an unconditional right to intervene by a federal statute. That federal statute in this case is 42 USC 2000 E5 F1, which provides that a person aggrieved, which is Ms. Lowe in this case, shall have the right to intervene in a civil action brought by the EEOC. So she shall have the right and the court must allow it. I think you're absolutely right that she had the right to intervene, but that issue only becomes relevant here if the EEOC is right with regards to at least some of the merits arguments, right? Because if the complaint doesn't state a client to intervene, there's nothing left to be done, right? So I knew this was the question I was gonna ask, and I think the issue is that my client has never been able to have a minute in court on this claim, and to deny her that right because of the actions of two other people, right, the EEOC and the defendants litigation, without allowing her at all to participate, which is fundamental to the whole scheme of this EEOC enforcement mechanism. I think that it's such a big error to not allow her to pursue her claim, that there does need to be a way for her to litigate her ADA claim. She does not, she can't litigate them now. I know, and what, okay, so, and here's, and I know you're advocating for your client, and I think that's obviously what you should be doing, but what happens with your client's intervention if the EEOC is wrong, and the district court was right on the merits? What does the remand order look like? I think that the remand order should allow my client to brief this issue. After we've already decided that the complaint doesn't state a claim? I think that it, you know, to do otherwise would be to say that the district courts do not have to grant these motions to intervene, that as long as they think the EEOC is ultimately going to lose, they don't have to grant these motions to intervene, and this motion should have been granted on day one. There's no reason for that delay, and just to affirm the court's actions in this case. No, you could find that it was error easily, and just say that there's nothing that can be done about the error now, when you could point out that the district court made, again, I speak only for myself, not for my colleagues, but I think given the language of the statute and the language of Rule 24, that your client had a right to intervene and should have been allowed to do so. The question is, what happens if the case goes away with regards to her intervention rights? Don't those evaporate as well? I mean, if she had been allowed to intervene, right, and the district court did what it did, case comes up here, and the EEOC loses, what happens to your client's intervention? You're saying your client would have asserted or can assert some different legal theory or some different argument that might save the day, if the EEOC is wrong? I think it's possible that she may have argued something. She does have other claims the EEOC can't bring. Right, but those would not, the EEOC's action would not bar those claims. Right. So, yeah, I mean, and for that reason, of course, we would ask that the EEOC's case update our claim as well, and I think that the authority in the brief, both ours and the EEOC's, show that the district court was incorrect in ruling that the ADA does not protect this action where the discriminatory claims have been made. All right, thank you so much. Before you sit down, why is this not coordinated at the outset with the EEOC and the person who's making the claim? Why don't they get together and just file a joint lawsuit? That isn't the mechanism that was set up by Congress. The EEOC decides whether or not to litigate the case. The individual doesn't have a say in that. Well, I know, but once the EEOC decides to litigate it, does the EEOC then want the name person in the case? The EEOC, no, there was nobody trying to keep the plaintiff out just for some reason. Okay. The motion sat there for eight months before this case was dismissed. Why doesn't the EEOC, they don't reach out and say, well, you want to be a plaintiff with us? The EEOC does generally inform the individual that they intend to file litigation, and I think that's They say to the individual, would you like to join it, or no, you can't join it, or how does that work? That is just not how it is done. The individual has to affirmatively tell the court that they want to join it. In a lot of these cases, the individual doesn't do that. They let the EEOC litigate the case, and they don't join it. In this case, my client specifically wanted to protect her own rights by joining in the litigation, but it isn't Why couldn't your client ask the EEOC, let me be a plaintiff with you? I think the way that the laws and the rules are set up, it has to be done this way. They have to file the motion. Okay. Thank you for explaining that. Good morning. May it please the court, there are three overarching or guiding themes in this appeal. The first is that the EEOC, and this is the most predominant appeal. Don't worry, it's not your fault. No one is blaming you. Concerning the first and most predominant theme is that the EEOC calls for an overly broad interpretation of the ADA that would extend its coverage to potential discrimination claims in the future against individuals in the present who are perfectly healthy and do not meet the ADA's definition of disability and who have no known association with a person with a known disability. The ADA already, although it doesn't necessarily cover this case, the ADA already protects some individuals who are completely healthy and have no disability, right? You agree that if someone is regarded, if an employee is regarded as having a current disability, mistakenly, and is discriminated against because of that perceived disability, the ADA kicks in. Correct. I absolutely agree with that. In this case, there is no claim by the EEOC, however, that Ms. Lowe was mistakenly regarded as having Ebola at the time of her discharge. But do you agree that having Ebola is a disability? Yes. And do you agree that Ms. Lowe had some association with people who had or who the company believed had Ebola? No. Why not? Because at the time that Ms. Lowe was discharged on October 22, 2014, she had not yet traveled to Ghana where the Ebola crisis was raging. But do you need a physical association with a person? Does association need to be limited to a physical association or can it be some other kind of association? I think the word is broader than that, right? In order for, and I'll try to answer directly, in order for the employer to fear that Ms. Lowe would contract Ebola, for example, from an individual, would require, and to take adverse action, which is a key factor based on that belief, that would require some level of interaction or association that would at least suggest that there was a possibility that Ms. Lowe could contract the disease, not traveling in the future across the continent to the country of Ghana. She had called into the office just to report to her colleagues what a great time she was having and also said that she happened to walk by an Ebola clinic and that was pretty scary, but she felt like everything was fine. And at that point, could the EOC say, well, you've, and the company fires her? At that point, has she had an association with someone with a disability? Judge, may I respectfully request clarification on that? Sure. If she called and said, I am hanging out with people who have Ebola, and they said, well, you're fired, would that be actionable under the ADA? Okay. I believe that, yes, that that could be actionable under the ADA. So it's all a matter of timing? It's a matter of timing to the extent that the definition of disability has to be met at the time of the alleged adverse action. Or perceived disability. Correct. Or perceived disability. Yes, sir. Why did they fire her? They fired her based on fear. Correct. Based on fear that Ms. Lowe, in her travels to Ghana, West Africa, during the Ebola crisis, may, and as the EOC initially, you've heard much today about imminently, but initially it was that she could contract Ebola, then it kind of transformed to would contract Ebola, and now it's that she would almost certainly and imminently contract Ebola. Well, don't worry about his words. Use your client's own perspective. They fired her because they feared that she would, what? That she could contract a contagious disease in the course of her future travels. So it's a matter of timing again? Again, the statute itself requires proof of causation. So when that adverse action takes place, yes, it is a matter of timing because it has to be based on an actual or perceived physical or mental impairment, not one that may arise at some point in the future or may not arise at some point in the future because no one really knows. Okay, well, let's change the facts a little bit and see if we can bring this a little bit more of a clear resolution. She has a relative of hers from Ghana travel to the United States or a friend to visit her. She tells a friend at work, oh, you know, my cousin from Ghana just came over to visit me. She's having a great time, first time in the United States. The employer says, oof, don't want to take a chance given the sort of work that we do and the sort of clients that we provide services to. You're fired. Is there a claim? I believe there's a potential claim because there she would have a, actually, let me backtrack a bit. There she would at least have a known association with her cousin. However, whether or not there's a claim turns on whether the court determines that in the association provision the reference to known disability of a person with whom the qualified individual is known to have an association or relationship, whether that known disability equates to also a perceived disability. My apologies. I didn't mean to go off on the associational track. I'm talking about a pure discrimination claim. They say, well, now that your cousin is here, your cousin comes from Ghana, you know, there was a raging Ebola epidemic in Ghana, and so we have a fear that by associating with her, you're going to get Ebola. So it's not an association thing. They just think she's likely to get Ebola, and they fire her. Is there a claim? Respectfully, Judge Jordan, I believe that would be under the associational provision unless the court's example is brought under the regarded as prong. It is. Okay. All right, so in the court's example under the regarded as prong, then, yes, I believe there's a potential for a claim because we have an individual who is subjected to an adverse action because the employer believes or perceives her as having contracted this deadly disease. She hasn't contracted it. It's all a fear about her potentially contracting it, which isn't too different from what happened here except that the timing is different. I'm trying to see what the difference is between my hypothetical in this case, if you believe that my hypothetical presents a viable ADA claim. I believe the difference in the hypotheticals are that in your hypothetical, the individual may actually meet the requirement of being regarded as having a physical or mental impairment as is required. Why? She hasn't gotten it yet, and there's no indication that her relative or friend has it either. Because it encompasses a perceived impairment as well, and that perceived impairment can be mistaken and still be actionable. How is my hypothetical different than what happened in this case where she's going to go see her relative or friend in a day or two in Ghana? Because it would require the court to read out the element of causation in the statute, which requires an actual or perceived physical or mental impairment at the time of the adverse action. I know, but in my hypothetical, there's no impairment. She's perceived as potentially contracting Ebola because her friend or relative has come to visit her in the United States. In the facts as alleged in the complaint, she's terminated not because she has Ebola, but because there's a fear that she's going to contract it because she's with people who are in a country that has that epidemic. I'm having trouble seeing the distance between those two scenarios. In the first hypothetical, again, in that situation, which is regarded as hypothetical, the plaintiff or the prospective plaintiff could make a claim that she was discharged because she was regarded as having Ebola, and she could allege as supporting facts that she was interacting with her cousin. She told the employer, my cousin has Ebola. That's not my hypothetical. My hypothetical is that her cousin or relative doesn't have Ebola. The employee doesn't have Ebola, but the two of them have gotten together, and now the employer says, we're not taking any chances. You're fired. Okay, and I think the same analysis would apply, that the company still, it could be argued, and I certainly don't know how successful it would be, but it could be argued that because this individual was associating with her cousin who had been in this region where the Ebola virus, the deadly Ebola virus was raging, that by terminating this individual, somehow this individual was regarded as having Ebola. So I think that that is a possibility that comports with the proof of causation requirement under the statute. However, in the existing case, there is no claim by the EEOC that Ms. Lowe had Ebola at the time of her discharge, nor that the company mistakenly perceived her as having Ebola at the time of her discharge. Therefore, her discharge could not be based on an actual or perceived impairment that did not exist when she was discharged. You get the actual impairment from the language of 121021, which says being regarded as having such an impairment, right? Yes, Judge. But the Dictionary Act at least says that unless the context provides otherwise, words used in the present tense include the future as well as the present. Why does the Dictionary Act default rule not kick in here? Because context indicates otherwise. Context, again, requires proof of an actual or perceived impairment at the time of the adverse action. Why is that so? That's what I'm trying to ask. Why is the Dictionary Act inappropriate here as a default rule? Because the context of the statute indicates that the Dictionary Act's applicability would not serve the plain text of the statute. It would be contrary to the plain text of the statute, which requires that an individual establish that he or she has been subjected to an action prohibited under the ADA because of an actual or perceived physical or mental impairment, not one that may develop in the future, for which we don't really know if it would or would develop in the future. We don't know if Ms. Lowe would come back from Ghana if she had sought reinstatement or rehire. We don't know if the company would have said, wait 21 days, let's see if you develop a fever, and welcome back. We don't know if the company would have said, no way, forget it, you traveled to Ghana, we're not hiring you because you might have Ebola. We don't know if the company would have said, you know what, we're short-staffed, come on back to work. This is a very dangerous interpretation of the regarded as prong, as well as the association provision that the EEOC seeks in this case. Doesn't the district court's ruling in this case sort of allow you to bypass the direct threat defense by just firing an employee based on perception and not having to deal with what happens when the employee does develop a disability that creates a problem for the employer? Judge, I think that's something that certainly the EEOC would agree with you on. However, in that regard, it is for Congress to make that type of determination. We must look to the plain language of the statute and presume that Congress says in the statute what it means to say in the statute. The interpretation of that statute forced by the EEOC does not create ambiguity. The court, the thrust of the EEOC's argument is that the statute would be better served as well as congressional intent if we would somehow remediate this unfair act. But the fact of the matter is this act does not constitute a violation of the ADA, which the district court properly concluded. As to if I may briefly address Kimberly Lowe's counsel's arguments, there is no unconditional or permissive right to intervene in substantively defective litigation. But you're putting the cart before the horse because you're assuming that the litigation is defective but the intervention decision has to be made before a court decides whether a complaint goes forward or not. The relevant statute says that a person in her position shall be allowed to intervene. That seems to me to be unconditional in a case like this. That doesn't mean the complaint goes forward. You could be right that the complaint could be defective and needs to be dismissed, but that doesn't affect her right to intervene, right? You're telling me that a court is supposed to figure out the merits before deciding intervention? What I'm saying to the court is that Ms. Lowe's offered no case law standing for the proposition that the district court had a duty to rule on her motion to intervene before deciding the facial challenge presented by our client, Ms. Sagenvy, to the EEOC's underlying litigation, whether that be one day after it was filed or sometime within the eight-month period that was calculated by counsel for Ms. Lowe. And I point to one other factor. I see that I'm out of time. May I continue on this final factor? Ms. Lowe speculates or told the court today that it would be possible that she would make arguments or claims that she wasn't permitted to make. However, under the Supreme Court decision in EEOC v. Waffle House, once the EEOC takes that case, the only alternative a prospective plaintiff has is to become a plaintiff in intervention. That's just the state of the law. For Ms. Lowe to contend perhaps that the denial or the termination of her motion to intervene operated as a denial, it would be harmless error because ultimately the district court found the EEOC had no case in which she could intervene. The court need only look to what Ms. Lowe did and did not do in the record and not engage in speculation as to what she would have done. She filed a proposed motion to intervene and proposed complaint in intervention, asserting only one claim under the ADA, a regarded-as claim. And for eight months while that case was pending, never sought to amend her motion to intervene, to make any new arguments or add any new claims, waiting to see. You may be making too much of this from my perspective because if a court doesn't allow her to intervene, what is she supposed to do? She's waiting for the court's permission to engage in action as a party. And if the court doesn't give her leave to do so, everything she's going to put on the record is just going to sit there and wait until intervention status is granted or not. But you and I may have a difference of opinion on that. Ms. Wei, thank you so much. Thank you very much. And sorry about the mishap with the microphone. Mr. Horowitz. Your Honors, if I can just address a few points very quickly. First, I want to correct counsel's contention that Ebola was raging across Ghana in 2014. In fact, there was no Ebola in Ghana in 2014, not in Ghana or in any of the countries that surround Ghana at that time. That doesn't really matter. Well, correct, Your Honor. It doesn't exist. Because if the employer is completely mistaken about something but it turns out that the state of affairs was different, you may potentially still have a discrimination claim under the ADA. No, that's exactly right, Your Honor. The only reason I bring it up is because counsel said that given the context of the statute, the Dictionary Act shouldn't apply. But, in fact, this is exactly the sort of case where an employer's unfounded concerns and mistaken beliefs, such as with Ebola in Ghana, most centrally does apply. So, in fact, it's sort of hard to think of a situation where the Dictionary Act would apply, where it was more in line with the statutory context. I'm going to interrupt you because I'm not sure that either of you are right about what the statutory context means. I don't think that context is a synonym for purpose. I think that context means something else. One question I have for you is in what way would you put being regarded as having into the future tense? What does that language look like? Being regarded as imminently having, as soon having, as having in the future. So I think that's right. The concern I have about that is that that's not just changing the tense of a verb. It's adding in different words, which is not really what we do with the Dictionary Act. Well, with the Dictionary Act, I mean it – Usually it's will have or something small like that rather than imminently or certainly or – I mean the way the statute is written, it becomes sort of ugly to look at the verbs in that way. But really it is looking at the verbs in that way. It's saying regarded as will to be having. My concern is that even though it's intuitive to try to provide protection against what really is a totally unreasonable decision by Basaj and Vedha, I'm frankly surprised they didn't address before now by some sort of settlement. That's not relevant to our decision. But it seems that the context is whether those words can easily be read in the future tense. It seems like that's one way we might look at context and say is it a simple change to understand it this way or is it something that really changes the meaning in a broader way? I take Your Honor's point, but I don't think the simplicity of application of the future is really what determines whether or not the Dictionary Act applies here. It's clear that the statute says if you regard it as having an impairment, then you come under the protection of the statute. So if you regard it as having an impairment in a week in the future, that should come under the statute as well. It might not be a pretty way of rewriting the statute, but it does give just future effect to present tense in the statute. One more question if I may. The Supreme Court said in Sutton, which ended up there was a legislative override of Sutton on a different issue, of course. But the Supreme Court said the phrase substantially limits appears in the act in the present indicative verb form. And so we think the language is properly read as requiring that a person be presently, not potentially or hypothetically, substantially limited in order to demonstrate a disability. Now, of course, the substantially limited part was abrogated by statute. But nothing about the tense. Why shouldn't we follow the Supreme Court's guidance in understanding how Congress used tenses in this particular statute? Well, the 80 AAA emphasized that in Sutton was one of the reasons that Congress passed the 80 AAA, and that was to emphasize that employees were to be given the maximum possible protection under the language of the statute, which Congress had found that the Supreme Court hadn't been doing in Sutton and in other cases interpreting the ADA. And here again, there is this imminence aspect to it that really makes the causation clear. I think that Your Honor is perhaps concerned about this idea of there being a lack of causation to the extent there is more of an attenuated connection. But here there really is no attenuation. Here there is no question about causation. And so in that case, it does seem like it's fully within the context of the statute and really is not at all a contextual. The EEOC has not engaged in formal rulemaking on this issue, right? That's correct, Your Honor. That's correct. But I would just point out that courts routinely take this approach when applying the anti-discrimination statutes, that you have in the Robinson case, the Supreme Court specifically held that the anti-retaliation provision of the ADA applies not just to current employees, but former employees as well. And courts routinely address that with the reassignment to a vacant position part of the ADA as well, saying it doesn't have to be a position that's vacant at the moment. It can be a position that's soon to become vacant. And similarly, this case in Pareto with the FMLA. So all of these show that courts are perfectly capable of applying these tense arguments in a sensible way. Can you tell me why the Eighth Circuit case is wrong? I assume you think Morris v. BNSF is wrongly decided? Certainly, Your Honor. Why is it wrongly decided? What is the court error there? It was somebody that was obese, and that was the obesity case. Because you're going to likely, and it's quite well documented, that's going to cause future health problems. And the Eighth Circuit said that didn't fall within the regarded prong. So there were a few – first of all, we would say that the – Is our case just different from that, or is that one wrongly decided? Both, Your Honor. That case was wrongly decided to the extent it didn't consider morbid obesity to be itself a disability. And also because given that the employer in that case clearly was making its decisions based on diseases that it associated with morbid obesity, that it regarded the employee at issue there as being disabled at the present point. But in addition, I would say that that is, again, applying the language and the guidance which talks about the characteristic predisposition to illness. And here there is no characteristic predisposition at issue. But if Your Honor is concerned about the analysis, again, the Shell case I think really does address that specific issue very concisely and very comprehensively. All right. Thank you very much. Thank you, Your Honor.